[Dkt. Ent. 37]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

---

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff,

        v.

BRETT A. COOPER, et al.,

     Defendants.

---

Civil No. 13-5781 (RMB/AMD)

**OPINION**

---

Plaintiff, the Securities and Exchange Commission (the "SEC" or "Commission") has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure against defendant Brett A. Cooper ("Cooper"). The SEC has also moved pursuant to Rule 55(b)(2) for default judgment against Cooper's purported alter egos Global Funding Systems LLC, ("Global Funding"), Dream Holdings, LLC ("Dream Holdings"), REOP Group Inc. ("REOP"), Fortitude Investing, LLC ("Fortitude"), and Peninsula Waterfront Development, L.P. ("Peninsula") (Global Funding, Dream Holdings, Fortitude and Peninsula are collectively, "the Cooper Companies") (Cooper Companies, REOP and Cooper are collectively, the "Defendants").[1]

---

[1] The Court is aware that the SEC has also moved for summary judgment against the defaulted defendants, REOP and the Cooper Companies. The Court does not find that summary judgment is appropriate against the defaulted parties as this juncture, and

I.   <u>BACKGROUND</u>

In its Complaint, the SEC alleges that Cooper, the Cooper Companies, and REOP employed fraudulent schemes and deceptive acts, and made untrue statements of material fact or omitted material facts, in connection with the purchase or sale of securities in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. Further, the Complaint alleges that Cooper aided and abetted the Cooper Companies' violation of these statutes and the rule. Complaint ("Compl.") ¶¶ 27-37. The Complaint also alleges that Cooper induced, or attempted to induce, the purchase or sale of a security without being registered with the Commission as a broker or dealer, or an associated person of a registered broker or dealer, in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a). Compl. ¶¶ 38-40.

In general, the Complaint alleges and the evidence adduced by the SEC establishes that from November 2008 through April 2012, the Defendants engaged in three schemes that defrauded at least 11 investors out of approximately $2.1 million. The first

_____

instead addresses the SEC's motion with regard to the Cooper Companies and REOP as one for default judgment. <u>See</u> SEC Br. at 1, n.1.

2

two schemes involved fictitious "Prime Bank" instruments and trading programs that promised extraordinary returns in a matter of weeks. The third involved a "finder's fee" scheme where defendants Cooper and REOP provided fraudulent documents to investors and collected $50,000 that they did not earn. Compl. ¶¶ 1-4; SOF ¶¶ 33, 120-23.

Cooper has never been licensed to sell securities or registered with the Commission in any capacity. SOF ¶ 7. He is the sole Managing Member of Global Funding, Dream Holdings and PWD Philadelphia Unit, LLC, the general partner of Peninsula. SOF ¶¶ 8-9, 11, 17-18. He is the founder and sole Principal of Fortitude and the sole Director of REOP. SOF ¶¶ 10, 12, 17. Cooper had ultimate authority over statements made by REOP and the Cooper Companies, and was the only person to represent these entities in connection with the "Prime Bank" and "Finder's Fee" transactions described in the Complaint. SOF ¶¶ 13-14, 17-18.

During the relevant period, neither REOP nor the Companies maintained any formalities of incorporation. They did not hold board or executive meetings, nor did they have any employees, directors, officers or principals besides Cooper. SOF ¶¶ 8-12, 17-18. The addresses Cooper used to register REOP and the Cooper Companies were either his personal addresses or temporary office rental locations. SOF ¶¶ 8-12, 17-18. REOP and the Cooper Companies had no operations – Cooper's sole income during the

3

relevant period was from the fictitious transactions alleged in the Complaint. SOF ¶¶ 17-18, 35-36, 117. The funds in these entities' accounts were commingled with each other's and with Cooper's personal funds, and Cooper routinely used these entities' funds for personal items like gambling trips to Vegas and the Bahamas, cruises, hotels, expensive cars, designer clothes, and retail expenses. SOF ¶¶ 17-18, 35, 42, 45-46, 53, 65, 67, 71, 74, 84, 95-96, 107-08, 117-19, 122-23.

A. **Schemes Alleged by the SEC**

The evidence put forward by the SEC, as summarized below, demonstrates that Cooper carried out a variety of financial schemes.

i. **Classic Prime Bank Transactions Scheme**

During 2008 through 2011, Cooper, through the Cooper Companies, lured investors into fictitious "Prime Bank" or "High-Yield" investment contracts with the promise of extraordinary returns on their investments in a matter of weeks, with little to no risk. SOF ¶¶ 32-33, 35-38, 47- 48, 57-59, 68, 74, 77-78, 81, 89, 99, 108. The purported investments involved the purchase of bank instruments, including "standby letters of credit" ("SBLCs") and "bank guarantees", from major international banks. SOF ¶¶ 35-46, 56-67, 68-74, 75-86, 87-96, 97-108. The instruments were to be "monetized" or "traded" on a "platform" generating astronomical profits from complex and

4

secretive transactions. Id. None of the investors received any returns on the money they invested with Cooper and the Cooper Companies, and none of it was used to acquire any bank instruments or SBLCs. When asked at his deposition about facts relating to his schemes and if he was presently involved in "Prime Bank" or "High Yield" investments, Cooper declined to answer and asserted his privilege against self-incrimination under the Fifth Amendment to the U.S. Constitution ("Fifth Amendment Privilege"). He also failed to respond to Plaintiffs' request for admissions about these transactions. See Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.").[2]

### ii.  Fraudulent Escrow Account Information Scheme

In February 2011, Cooper was approached by an associate named Jack Riley about partnering with a company called Alliance Building Systems ("Alliance") to invest in a purported "Swiss

---

[2] The First Request for Admission contained the instruction that failure to respond within 30 days would prompt the SEC to request the matters admitted. SOF ¶ 18. Plaintiff has argued in his very brief response to the SEC's Statement of Undisputed Material Facts that he told the SEC he would "plead the fifth to all written requests." Resp. to Pl.'s Statement of Uncontested Facts, at 1 [Dkt. No. 43.]

Cash Trade" private placement program ("Swiss Cash Trade program"). SOF ¶¶ 87, 96. Under the Swiss Cash Trade program, a purported entity named Leybourne Holdings Limited ("Leybourne") would purchase and monetize a "One Hundred Million Euro Bank Guarantee" by placing the instrument into "trade". Id. In response, Cooper told Riley that he had a client with $5 million in attorney David H. Frederickson's client trust account and suggested that Cooper and Alliance each use their investors' funds to contribute half of the 3 million euro required for the purported deal and recommended Frederickson act as escrow agent and take possession of the combined funds. SOF ¶¶ 88-89, 96. Shortly thereafter, Cooper, through Global Funding, executed an agreement with Alliance and Leybourne, which stated that upon receipt of the 3 million euros, Leybourne would be "ready, willing and able" to purchase a bank guarantee from "a top twenty five world bank which will be delivered via [SWIFT] MT760" to an account with "Barclays Bank" in Geneva. SOF ¶ 89. In reality, neither Cooper nor Global Funding had an investor with $5 million in escrow with Frederickson. SOF ¶¶ 88, 96.

Cooper sent Frederickson a "final version" of the escrow agreement for the Swiss Cash Trade program that contained 11 paragraphs, but did not include any account information for Frederickson's client trust account. SOF ¶¶ 90, 96. Cooper sent Riley an escrow agreement for transmittal to Alliance and its

6

investors, which included an additional 12th paragraph that
Cooper inserted. SOF ¶¶ 91-92, 96. Below the new paragraph,
entitled "WIRING INSTRUCTIONS TO BANK OF THE ESCROW AGENT", the
account type was listed as "Attorney/Client Trust- IOLTA" and
the account name was "DHF LLC". Id. But the account number
Cooper provided was not Frederickson's. SOF ¶¶ 94, 96.
Unbeknownst to the investors, Cooper had recently filed
documents adopting Frederickson's initials (DHF) for one of
Cooper's companies, which allowed Cooper to make it appear as
though the account name on the wiring instructions was for
attorney Frederickson's account when it in fact it was for Dream
Holdings' account. Id.

    In order to raise its share of the program funds, Alliance
(through a related entity) entered into joint venture agreements
with four investors: Francis Musso, Calibrated Capital, Fisher &
Associates and James Shannon Logan. SOF ¶ 93. Those investors
wired $925,000 to the bank account number provided by Cooper.
SOF ¶¶ 93, 96. A few days after receiving the investors' money,
Cooper spent it on hotels, cars, and other personal items. SOF
¶¶ 95-96.

### iii. Brazilian Bond Fee Scheme

    In April 2012, Cooper and his company REOP entered into a
finder's fee agreement with the owners of a purported Brazilian
bond whereby Cooper and REOP would be paid $50,000 for finding a

bank or brokerage firm to accept the bond for listing and eventual sale. SOF ¶ 109. Cooper contacted Fred Schrodt ("Schrodt"), a representative at Penserra Securities LLC ("Penserra"), about opening an account at the broker-dealer, but the bond was never accepted by the firm. SOF ¶¶ 110, 114, 116.

While Penserra was reviewing the deal, Cooper or others acting at his direction or with his knowledge sent a forged email purportedly from Schrodt, though misspelling his name, to counsel for the seller, responding to counsel's questions about the transaction. SOF ¶¶ 112, 116. A few days later, Cooper or others acting at Cooper's direction or with Cooper's knowledge drafted and sent a letter, purportedly from Schrodt, to counsel for the bond owner indicating that Penserra had "accepted" the bond. SOF ¶¶ 110-111, 116. In actuality, the letter was a forgery. Id. Penserra confirmed that the letter was not drafted by its employee or on any of its systems, and it was not transmitted using its network. Id. Indeed, the letter's metadata showed it was authored by "Brett-toshiba". Id. Cooper was asked during his deposition if he drafted the letter or owned a Toshiba computer. He acknowledged he participated in drafting the letter and stated it "was possible" he owned a Toshiba computer. SOF ¶¶ 111, 116. No Brazilian Bond was ever "accepted" by Penserra. SOF ¶ 114. Cooper was paid a $50,000 "fee" even

though he and REOP had not satisfied the terms of the agreement. SOF ¶¶ 113-114.

**B. Report of the SEC's Expert Witness, Professor James E. Byrne**

The SEC retained Professor James E. Byrne as its expert witness to opine on Defendants' transactions, including the resemblance of the fraud alleged in this case to typical "Prime Bank" or "High Yield" investment schemes. Professor Byrne concluded that the investments offered by Cooper and the Cooper Companies lack legitimacy and are, instead, instances of "Prime Bank" or "High Yield" investment schemes. Professor Byrne also concluded that the transaction with REOP and Cooper involving a purported Brazilian Bond is a "Finder's Fee" scheme, "where a fee is claimed and paid on the basis of a representation that turns out to be worthless." SOF ¶¶ 20-21, 24-25; Byrne Report, Ex. A ¶¶ 3, 20, 25, 84-86, 91.

In his expert report, Professor Byrne stated that the "investments" offered by Cooper and the Cooper Companies "do not exist in legitimate finance." SOF ¶ 23; Byrne Report, Ex. A ¶ 25. They "do not yield or pay any funds and the bulk of the principal is invariably dissipated." Id. Professor Byrne highlighted a few of the common features of "Prime Bank" or "High Yield" schemes, including: (1) offered returns that are disproportionate to the low risk involved; (2) promises that the

investments or returns are "safe"; (3) mimicking of legitimate financial instruments and tools like SWIFT messaging and SBLCs; (4) obscuring of the commercial basis for and source of the return, often under the rubric of some obscure or implausible "trading"; (5) significant technical flaws in spelling, use of terms and phrases, terms of art, or confusing transactions that would not be expected in a legitimate investment of the same caliber; (6) improper references to legitimate financial institutions or similar organizations; (7) unnecessary secrecy; (9) misuse of attorney, escrow, or trust accounts; (8) an international dimension to the transaction; and (9) no investment of perpetrator's own funds despite attractive returns. SOF ¶¶ 23-24; Byrne Report, Ex. A ¶¶ 26, 29-91.

## II.  <u>SUMMARY JUDGMENT</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." 14 Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." <u>Id.</u>

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all

reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252.  Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 373, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P.

56(e)).  The non-movant's burden is rigorous: it "must point to
concrete evidence in the record"; mere allegations, conclusions,
conjecture, and speculation will not defeat summary judgment.
Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995);
Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing
Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228
(3d Cir. 2009)) ("[S]peculation and conjecture may not defeat
summary judgment.").

Additionally, Defendant Cooper is appearing in this case
pro se.  As such, this Court is mindful of the requirement that
pro se parties' submissions must be construed liberally.  Paris
v. Pennsauken Sch. Dist., Civ. No. 12-7355, 2013 WL 4047638
(D.N.J. Aug. 9, 2013).

As to the remaining defendants, REOP and the Cooper
Companies, who have all defaulted, "[b]efore granting a default
judgment, the Court must determine (1) whether there is
sufficient proof of service, (2) whether a sufficient cause of
action was stated, and (3) whether default judgment is proper."
Teamsters Health & Welfare Fund of Phila. & Vicinity v. Dubin
Paper Co., No. 11-7137, 2012 WL 3018062, at *2 (D.N.J. July 24,
2012) (citations omitted).  Whether default judgment is proper
depends on (1) whether a plaintiff will be prejudiced if default
is not granted, (2) whether a defendant has a meritorious
defense, and (3) whether the defendant's delay is the result of

12

culpable misconduct.  See N.J. Bldg. Laborers' Statewide Pension Fund and Trustees Thereof v. Pulaski Construction, No. 13-519, 2014 WL 793563, at *3-4 (D.N.J. Feb. 26, 2014) (citing Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000)).

### III. **ANALYSIS**

The evidence as put forth by the SEC shows that no genuine issue of material fact exists concerning whether Defendants violated the statutes and rules as alleged by taking investors' money for their personal benefit using material misrepresentations and omissions, and by engaging in deceptive acts, practices and transactions without even attempting to use the money in any way likely to realize any return.

When Cooper was asked about his "Prime Bank" and escrow account schemes during his deposition, he invoked his Fifth Amendment Privilege—indeed Cooper's response to the most questions in his deposition was to invoke his Fifth Amendment rights. A court in a civil action may draw an adverse inference against a party that asserts his Fifth Amendment right against self-incrimination, as Cooper did in his deposition and in his responses to discovery requests. See SEC v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 525 (D.N.J. 1999) ("Invocation of one's Fifth Amendment privilege in civil cases, either in depositions or at trial, permits an adverse inference to be drawn against the party invoking the privilege." (citing Baxter

v. Palmigiano, 425 U.S. 308, 318 (1976))). Indeed, as an exercise of abundant caution, this Court entered an Order advising Defendant Cooper that his frequent invocation of his Fifth Amendment Privilege will not prevent this Court's adverse findings or even summary judgment against him.[3] [Dkt. No. 46.] Defendant Cooper filed no further opposition to the summary judgment motion other than his previously filed general denials and Fifth Amendment invocations, along with a brief one-page memorandum, which principally and summarily contests Cooper's liability for the Cooper Companies' conduct. [Dkt. No. 43.] The remaining defendants did not appear and, accordingly, default was entered by the Clerk of this Court against them.  [Dkt. Ent. 28.] [4]

---

[3] The Court's previous Order corrected Defendant's apparent "impression that a material issue in dispute might be created by a refusal to admit a certain fact or by a lack of response to certain questions." Feb. 25, 2015 Ord. at 4. The Court further noted that, "[N]o court can decline to grant summary judgment on the basis of mere bold allegations or denials by the non-movant: instead, evidence must be produced by the non-movant to establish that a material fact is in dispute. Feb. 25, 2015 Ord. at 5.

[4] Pursuant to the above-described analysis for default judgment, the Court determines there has been adequate proof of service of REOP and the Cooper Companies. [Dkt. Nos. 12-23 (affidavits of service).] Moreover, the Court finds that sufficient causes of action were stated in the Complaint. With regard to whether default judgment is proper, the Court finds the factors weigh in favor of granting the SEC's request. The Court finds that the voluminous record assembled by the SEC in the years of the litigation against all Defendants is sufficient to prejudice the SEC by denying default judgment. See Nyholm v. Pryce, 259 F.R.D. 101, 105 (D.N.J. 2009) (finding no prejudice where plaintiff had

A. **SECTIONS 10(b) AND 17(a)**

To establish a violation of Section 10(b) and Rule 10b-5 of the Exchange Act, the SEC is required to prove that by using any means or instrumentality of interstate commerce or of the mails in connection with the purchase or sale of a security, the Defendants, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak, as was the case here) or used a fraudulent device. SEC v. Antar, 15 F. Supp. 2d 477, 528 (D.N.J. 1998). Liability for fraud under Section 17(a)(1) of the Securities Act is similar.[5]

Scienter means intent to deceive, manipulate or defraud. See Infinity Grp. Co., 212 F.3d at 192, nn. 12-13. To establish a corporation's scienter, the mental state of an officer acting

---

only expended "minimal efforts" in the litigation). As outlined below, the evidence adduced by the SEC against all Defendants is considerable, and the Court—even assuming it had a duty to—has identified no meritorious defense. See Pulaski Construction, 2014 WL 793563, at *3 ("The Court has no duty to construct a defense for Defendant."). Moreover, because Defendant Cooper was served as the representative of these companies, his personal appearance, but the failure of the Cooper Companies and REOP to appear amounts to culpable misconduct. As such, the Court will enter default judgment against REOP and the Cooper Companies.

[5] See SEC v. Infinity Grp. Co., 212 F.3d 180, 191 n.11 (3d Cir. 2000) ("Section 17(a) makes it unlawful for any person in the offer or sale of any security to: (1) employ any device, scheme or artifice to defraud; (2) obtain money or property by means of any untrue statement or omission of material fact; or (3) to engage in any transaction, practice or course of business which operates as a fraud or conceit upon the purchaser." (internal quotation marks and alterations omitted)).

on the corporation's behalf may be imputed to it. See, e.g.,
Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1106-07 (10th Cir.
2003). However, the scienter element required under Sections
10(b) and 17(a)(1) is satisfied by proof of recklessness,
defined as "an extreme departure from the standards of ordinary
care . . . which presents a danger of misleading buyers or
sellers that is either known to the defendant or is so obvious
that the actor must have been aware of it." Id. at 192. Sections
17(a)(2) and 17(a)(3) require the SEC to prove only negligence.
See Aaron v. SEC, 446 U.S. 680, 701-02 (1980). To establish a
corporation's scienter, the mental state of an officer acting on
the corporation's behalf may be imputed to it. See, e.g.,
Kinder-Morgan, Inc., 340 F.3d 1083, 1106-07 (10th Cir. 2003).

Because "Prime Bank" instruments do not exist, courts have
held that promoters of such schemes acted, at a minimum,
recklessly. See, e.g., SEC v. Asset Recovery and Mgmt. Trust,
No. 2:02-CV-1372-WKW, 2008 WL 4831738, at *8 (M.D. Ala. Noc. 3,
2008) ("What 'prime banks' claim to offer—a combination of huge
returns and no risk—is inconceivable on its face and imposes a
heightened duty to investigate.") (internal quotation marks
omitted); SEC v. Montana, 464 F. Supp. 2d 772, 784 (S.D. Ind.
Nov. 22, 2006) (defendant "failed to verify the details of the
Trading Program, never mind its existence, including whether the
promised rates of return could actually be achieved or whether

16

the investor funds were, in fact, safe"); <u>SEC v. Gallard</u>, Civ.
No. 95 CIV. 3099(HB), 1997 WL 767570, at *4 (S.D.N.Y. Dec. 10,
1997) (defendant "accepted . . . fees for brokering transactions
in securities which, if they exist at all, seem to be the
financial world's equivalent of the rarest endangered species").

    **i. <u>Violations of the Antifraud Provisions of the Securities
Act and the Exchange Act – Prime Bank Schemes</u>**

      **1. The Financial Instruments in the Schemes Did Not Exist**

The evidence and relevant case law establishes that the
high return, low-risk prime bank investments Cooper and the
Cooper Companies offered to investors and purported to co-invest
in do not exist. Cooper, acting through the Cooper Companies,
made oral and written representations to, and executed contracts
with, investors describing investment programs whereby they
would acquire bank instruments, leverage them to increase their
value, and then enter a trading program generating massive
returns. There is no dispute that Defendants did not undertake
to complete such transactions. Not only did the investors not
receive their promised returns, all but one investor lost the
entirety of their investment because Cooper misappropriated the
funds for his personal use.

The SEC's expert report from Professor Byrne confirms that
the instruments and the purported "trading platforms" the
Defendants offered are fictitious and are generally associated

with so-called "Prime Bank" or "High Yield" fraud. SOF ¶¶ 20, 25; Byrne Report, Ex. A ¶¶ 3, 20, 22, 24-26, 41-42, 81-83, 91.[6] The characteristics of such frauds are identified in his report and are consistent with those recognized in numerous court decisions, most of them finding defendants liable on summary judgment. See, e.g., SEC v. Lyttle, 538 F.3d 601, 602-03 (7th Cir. 2008) (summary judgment affirmed against defendants promising high returns and requiring secrecy); SEC v. Graulich, Civ. No. 2:09-cv-04355, 2013 WL 3146862, at *5 (D.N.J. June 19, 2013) (summary judgment granted against defendants where "trading program purportedly involved the purchase and sale of fully negotiable 'prime bank' instruments"; Professor Byrne admitted as expert witness for the SEC); SEC v. Reynolds, No. 1:06-CV-1801, 2010 WL 3943729, at *1 (N.D. Ga. Oct. 5, 2010) (summary judgment granted against defendants representing that the low-risk investments involved the world's largest banks and major financial institutions with promised high returns); Asset Recovery, 2008 WL 4831738, at *7 (summary judgment granted against defendant found to be "trading in obscure bank instruments by unidentified persons in undisclosed locations, generating extraordinary returns-a typical 'prime bank' scheme"); Montana, 464 F. Supp. 2d at 785 (summary judgment

---

[6] None of the Defendants provided contrary expert testimony, nor did they depose Professor Byrne.

granted for fraud and lack of broker-dealer registration against defendant touting prime bank instruments that would generate extraordinary returns); SEC v. Roor, No. 99 Civ. 3372, 2004 WL 1933578, at *5 (S.D.N.Y. Aug. 30, 2004) (summary judgment granted against defendant who promised investors high returns and spent the invested funds on himself); Gallard, 1997 WL 767570, at *2 (summary judgment granted against defendant offering SBLC's, which court found are not available on any market).

The Defendants have not produced evidence suggesting that the investments they offered were legitimate. No evidence adduced by the SEC indicate that the investors' funds were used for the purposes for which they were intended or for which Defendants represented they would be used.

### 2. **The "In Connection With" Element of Securities Fraud**

Although the "securities" offered by the Defendants were non-existent, their actions nevertheless meet the requirements for liability in "connection with the purchase or sale of a security" as required under Section 10(b) of the Exchange Act and, as to sale, Section 17(a) of the Securities Act. The Defendants' transactions, as described to investors, satisfy the test of a security articulated by the Supreme Court in SEC v. W.J. Howey Co., where a person (1) invests money, (2) in a common enterprise, and (3) is led to expect profits solely from

the efforts of the promoter or a third party. 328 U.S. 293, 298-99 (1946), as cited in Infinity Grp., 212 F.3d 180, 187-88. "[T]he common enterprise requirement is satisfied by 'horizontal commonality', characterized by 'a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." Infinity Grp., 212 F.3d at 187-88. Investors paid Cooper and the Cooper Companies, to join their funds with others to acquire an alleged bank instrument, usually an SBLC or a "bank guarantee", which would then be "traded" on a "platform" to realize a quick, high return.

Defendants in prime bank cases often argue that because the offered securities do not exist, there can be no "connection with" the purchase or sale of a security. Such arguments have been universally rejected. See e.g., Graulich, 2013 WL 3146862, at *5 ("The investments offered by Defendants were securities because their trading program purportedly involved the purchase and sale of fully negotiable 'prime bank' instruments…."); Gallard, 1997 WL 767570, at *3 ("It is clear by now that the antifraud provisions relied upon by the [SEC] are applicable even where, as here, the 'security' at issue does not exist."); SEC v. Bremont, 954 F. Supp. 726, 732 (S.D.N.Y. 1997) ("Extending the protection of the securities laws to the victims of schemes so fraudulent that the underlying paper does not exist logically follows, as fraudsters would have a perverse

incentive to magnify their deceptive conduct.") (citation omitted). Likewise, it would be an absurd outcome to find the "securities laws do not apply to frauds so complete, so pure, that no pooling would ever take place." SEC v. Lauer, 52 F.3d 667, 670 (7th Cir. 1995) ("It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws.").

### 3. Material Misrepresentations and Omissions

Cooper, individually and through the Cooper Companies, materially misrepresented to investors the very existence of the financial instruments and the status of the fictional "investments" in bank guarantees and SBLCs, and did so using wire transfers, the internet, email, and the telephone. See SEC v. Stinson, No. CIV.A. 10-3130, 2011 WL 2462038, at *3 (E.D. Pa. June 20, 2011) (holding defendants' use of telephone, email, wire transfers and the internet satisfied interstate commerce requirement; collecting cases). According to the evidence put forth by the SEC, Cooper and his entities misrepresented the safety of the investors' funds through fake collateral and escrow agents, and lied to investors stating that, in the event that the deal failed, the investors' money would be returned. SOF ¶ 100, 101.  Moreover, the evidence shows that Cooper faked his identity, posing as an escrow agent, a registered representative at a broker-dealer, and signing documents using

others' names. SOF ¶ 69. When confronted by an investor regarding past frauds, he outright lied. SOF ¶¶ 103, 108.

The flow of money further proves that Defendants materially misrepresented the use of investor funds. Rather than invest any of the funds as promised, bank records prove that the $2.1 million wired from the victims went directly into bank accounts controlled by Cooper, and was spent for his benefit. SOF ¶¶ 17-18, 42, 45-46, 53, 55, 65, 67, 71, 74, 84, 95-96, 107-08, 117-19, 122-23. Defendants never intended to engage in any investment.

A misrepresentation or omitted fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). In the context of "Prime Bank" or "High-Yield" trading programs, "there is no question a reasonable investor would consider important the fact that the 'security' at issue did not exist . . . and that the money paid for those securities would be misappropriated." See Gallard, 1997 WL 767570, at *3; Asset Recovery, 2008 WL 4831738, at *7 (citing cases). The materiality of the "omission" that no investor funds would actually be invested in an asset or financial instrument for purposes of a return is clear. Had Cooper represented to an investor that his or her funds would be spent on first-class trips, expensive

clothes or with those involved with prostitution, no one would
have invested.

### 4. Additional Artifices and Devices and Engaged in Deceptive Acts, Transactions and Practices

The undisputed evidence also indicates that Cooper and the
Cooper Companies engaged in sham transactions that were non-
existent and misappropriated investor assets. By their very
nature, these transactions acted as a fraudulent scheme on the
deceived investors, in violation of the federal securities laws.
See SEC v. Boock, No. 09 Civ. 8261, 2011 WL 3792819, at *22-23
(S.D.N.Y. Aug. 25, 2011) (scheme liability extends to
misappropriated assets).

In addition to the misrepresentations and omissions
described above, Cooper engaged in at least the following
deceptive conduct, acts or practices: (1) inserted his own
account number into escrow agreements and used a misleading name
(DHF, LLC) to make it appear to investors that they were sending
money to an independent escrow agent, when in fact they were
sending their money to Defendant Peninsula SOF ¶¶ 90-96; (2)
created a fake escrow company called PWD Trust complete with a
fake website and fictitious attorneys which he used to send
emails and other documents SOF ¶¶ 50, 53-55, 58-61, 68-69, 74;
(3) created and supplied fake account statements to investors to
make them believe that their money was sitting in an escrow

account or that their investments were collateralized with cash, SOF ¶¶ 54-55; and (4) forged an email and a letter from a representative of a brokerage firm to make it appear a broker-dealer had "accepted" a Brazilian Bond entitling Cooper and REOP to a "fee". SOF ¶¶ 110-112, 116.

### 5. **Scienter Requirements of Section 10(b) and 17(a)(1)**

Cooper, and, through him, the Cooper Companies, meet the scienter requirements for fraudulent conduct. The evidence put forth by the SEC shows that Cooper acted knowingly to induce victims to wire money in connection with fictional investment schemes promising high returns in a short time at low risk. Cooper knew the investments did not exist. SOF ¶ 102. He knew the funds were wired into accounts that he controlled, and then he spent the money. Cooper also created a fake escrow company, complete with a website and email accounts, and two fictitious attorneys to run the nonexistent firm. SOF ¶¶ 50, 51-55, 58-59, 69, 71, 74, 84, 107. He then used that fake firm to lure investors into wiring millions into the bank accounts that he controlled. Id.

Cooper's scienter is further evidenced by the fact that, despite having spent almost all of the investors' funds on himself, he continued lulling investors into believing that a large return was possible by vaguely describing the status of the supposed transaction and blaming a fake escrow company—one that he himself created—for the delays. SOF ¶¶ 62-63, 72.

The same evidence also proves that Cooper acted with, at a minimum, reckless disregard of the truth or falsity of his misrepresentations and the materiality of his omissions to investors.

Professor Byrne's unchallenged expert report and all the evidence indicates that the transactions were fake, and Defendants have offered no evidence to the contrary. At least one court has held that a "total inability to provide any evidentiary support for the existence of the purported instrument or [defendant's] contacts with various banks establishes, as a matter of law, that he acted with scienter." Gallard, 1997 WL 767570, at *4. Because Cooper has the requisite scienter, it may be imputed to the Cooper Companies as well. See, e.g., Kinder-Morgan, 340 F.3d at 1106-07 (scienter of corporate defendant's agent is attributable to the corporation as a primary violator of section 10(b) and Rule 10b-5).

Accordingly, the Court grants the SEC's motion for summary judgment against Defendant Cooper on the claim that the Prime Bank Schemes violated the Securities Act and the Exchange Act. Pursuant to the above analysis, supra n. 4, the Court enters default judgment on this cause of action against the Cooper Companies and REOP.

### ii.  **Violations of the Antifraud Provisions of the Securities Act and the Exchange Act — Finder's Fee Scheme**

The evidence makes clear that Cooper, individually and through REOP, created a forged letter which purportedly entitled

them to receive a finder's fee for services that the Defendants did not render, in violation of Section 10(b) and Rule 10b-5 of the Exchange Act and Section 17(a) of the Securities Act. In his expert report, Professor Byrne describes the "phenomenon of finder's fee fraud," noting that "the basis for the fee . . . is typically based on a superficial event or document that can readily be manufactured by the fraudster. Thus, the fee is paid but the transaction is not consummated, leaving the victim with no recourse . . . ." SOF ¶¶ 21, 25; Byrne Report, Ex. A ¶¶ 28, 84-86.

Cooper and REOP were paid a $50,000 finder's fee that they did not earn. There is no dispute that Cooper and REOP never located a brokerage or bank willing to accept the bond; a fact that would be material to the investors. Accordingly, there can is no genuine dispute that the Defendants were not entitled to any compensation, let alone $50,000.

The fraudulent documents created and sent to the bond owner by Cooper and REOP prove the Defendants acted with the requisite scienter. Defendants fraudulently assumed the identity of a Penserra broker and sent an email to counsel for the seller responding to counsel's questions about the transaction. SOF ¶¶ 112, 116. Defendants then appropriated Penserra's logo and used it to draft and send a letter, purportedly from the firm, to counsel for the bond owner stating Penserra had "accepted" the

bond. SOF ¶¶ 110-111, 116. Penserra and its employee have disavowed any knowledge of the letter and confirmed that it was neither drafted nor sent using its systems. Notably, the metadata for the letter identified its author as "Brett-toshiba", a computer Cooper acknowledged he "may have" owned. Id.

Accordingly, the Court grants the SEC's motion for summary judgment against Defendant Cooper on the claim that the Finder's Fee Scheme violated the Securities Act and the Exchange Act. Pursuant to the above analysis, supra n. 4, the Court enters default judgment on this cause of action against the remaining defendants, the Cooper Companies and REOP.

## B. COOPER WAS THE ALTER EGO OF REOP AND THE COOPER COMPANIES

In determining whether to "pierce the corporate veil," courts in the Third Circuit consider the following factors: "failure to observe corporate formalities, . . . siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." Trustees of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003). The factors are not "a rigid test[;]" the essential inquiry is whether the "corporation is little more than a legal fiction." Id.

As discussed above and in greater detail in the SEC's Statement of Undisputed Material Facts, REOP and the Cooper Companies were fictional entities. At no time during the relevant period did REOP or the Cooper Companies maintain the formalities of incorporation.[7] They never held a single board or executive meeting, nor did they have any employees, directors, officers or principals besides Cooper. The addresses Cooper used to register the companies were either his personal addresses or temporary office rental locations. REOP and the Cooper Companies earned no legitimate income during the relevant period; all of the capital generated came from fraudulent investment schemes. Investor funds were routinely transferred between the multiple bank accounts for REOP and the Cooper Companies, before being depleted to pay for Cooper's personal expenses including gambling trips to Las Vegas, the Bahamas and Atlantic City, trips to Disney Resort, airline tickets, designer clothes, and numerous retail expenses. Thus, Cooper acted as the alter ego of the Cooper Companies and REOP.[8] See Lutyk, 332 F.3d at 194

---

[7] For example, Cooper invoked his Fifth Amendment rights when asked about the corporate formation and function of Global Funding. SOF ¶ 8.

[8] The Court is unpersuaded by Cooper's general denial that "The SEC has chosen to ignore the difference between the roles that Companies and I played in these contracts and that fact that it was the Companies themselves that directly received the funds." Def. Cooper's Mem. in Opp. [Dkt. No. 43.] To the contrary, the SEC's papers establish both through affirmative evidence and inference from Cooper's invocation of his Fifth Amendment

(affirming the piercing of corporate veil where there was a "dearth of corporate formalities and corporate records" and defendant siphoned funds from alter ego; noting that a finding of "constructive fraud and avoiding an inequitable result is often enough").[9]

### C. DEFENDANT COOPER FAILED TO REGISTER AS A BROKER-DEALER

Section 15(a)(1) of the Exchange Act makes it unlawful for a "broker" to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security, unless such broker is registered with the Commission or, in the case of a natural person, is associated with a registered broker-dealer. 15 U.S.C. § 78o(a)(1); SEC v. Kenton Capital, 69 F. Supp. 2d 1, 12 (D.D.C. 1998). Section 3(a)(4) of the Exchange Act defines a broker as any person "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C.A. § 78c(a)(4). Scienter is not required under Section 15(a)(1). See SEC v. Interlink Data Network of Los Angeles, Inc., Civ. A. No. 93-3073, 1993 WL 603274, at *10 (C.D. Cal. Nov. 15, 1993).

For nearly four years, Cooper effected transactions in securities, or induced the purchase or sale of securities, by

---

Privilege that Cooper was an alter ego for the Cooper Companies. Cooper's one page memorandum in opposition points the Court to no dispute of fact in the record with regard to alter ego liability.

[9] Because the Court finds that Cooper was in fact the alter ego of REOP and the Cooper Companies, it need not reach the issue of whether Cooper in fact aided and abetted the Cooper Companies.

bringing in at least 10 investors and more than $2.1 million in investor money into the Cooper Companies' prime bank schemes. Cooper was not registered as, or associated with, a broker-dealer. SOF ¶ 7. Accordingly, summary judgment against Defendant Cooper for violating Section 15(a)(1) is proper. See <u>Kenton Capital</u>, 69 F. Supp. 2d at 12 (summary judgment against unregistered defendant that defrauded investors out of millions of dollars).

D. **<u>RELIEF</u>**

    i. **<u>Injunctive Relief</u>**

The SEC is entitled to an injunction if it can show a reasonable likelihood that the defendant will violate the securities laws in the future. See <u>SEC v. Bonastia</u>, 614 F.2d 908, 912 (3d Cir. 1980); <u>Graulich</u>, 2013 WL 3146862, at *6 (quoting <u>Bonastia</u>). Specifically, "Section 20(b) of the Securities Act of 1933 and Section 21(d)(1) of the Securities Exchange Act of 1934 authorize the SEC to seek injunctive relief when a person or entity is 'engaged or is about to engage' in conduct constituting a violation of the Acts." <u>Graulich</u>, 2013 WL 3146862 at *6. To determine the likelihood of future violations courts, looking at the totality of the circumstances, may consider whether a defendant's violation was isolated or part of a pattern, whether the violation was egregious and

deliberate, and whether the defendant's business will present opportunities to violate the law in the future. See id.

Here, the Defendants acted with a high degree of scienter and engaged in multiple, recurrent and egregious violations of the securities laws. Cooper has never admitted his role in these fraudulent schemes which brought in millions of dollars, nor taken any responsibility for his actions.  Cooper and REOP engaged in the "Finder's Fee" scheme after being sued for fraud by multiple investors, being named as a defendant and served with the complaint in another prime bank case, and after becoming aware of the Commission's investigation in this matter.

Indeed, Cooper has recently held himself out as a "millionaire" investor, including on international news networks.[8] SOF ¶¶ 118-119. At his deposition, when asked if he was presently involved in "Prime Bank" or "High Yield" investments or Brazilian Bonds, Cooper asserted his Fifth Amendment Privilege. SOF ¶ 115.   Accordingly, pursuant to its grant of summary judgment, the Court orders injunctive relief against Defendant Cooper. The Court also grants injunctive relief against the Cooper Companies and REOP, pursuant to its entry of default judgment.

ii. **Disgorgement and Prejudgment Interest as to the Defendants**

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws". SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir. 1997) (citation omitted). The SEC "is not required to trace every dollar of proceeds misappropriated by the defendants . . . nor is plaintiff required to identify monies which have been commingled by them." SEC v. Hughes Capital Corp., 917 F. Supp. 1080, 1085 (D.N.J. 1996) aff'd, 124 F.3d 449 (3d Cir. 1997) (citation omitted). The SEC need only show its disgorgement figure "reasonably approximates" the defendants' ill-gotten gains. Id. Moreover, "the district court is . . . invested with broad discretion in fashioning an appropriate disgorgement order." Graulich, 2013 WL 3146862, at *7. Disgorgement typically includes prejudgment interest so that wrongdoers do not profit from interest-free loans on their ill-gotten gains. See Hughes Capital, 917 F. Supp. at 1089-90. When the defendants collaborated to violate securities laws, as is the case here, joint and several liability is appropriate. See Hughes Capital, 124 F.3d at 455.

Here, the SEC seeks disgorgement of $2,096,160 and prejudgment interest of $297,463, jointly and severally, from Cooper and the Cooper Companies for a total of $2,393,623 in

connection with the "Prime Bank" schemes. SOF ¶¶ 120-125. Separately, the SEC seeks disgorgement of $50,000 and prejudgment interest of $4,016, jointly and severally, from Cooper and REOP in connection with the Brazilian Bond scheme. Id. The disgorgement calculation is based on a forensic accounting review of Defendants' account records showing the total amount of investor funds Defendants fraudulently obtained. SOF ¶¶ 120-123. The Commission then applied the rate for the underpayment of federal income tax to arrive at a prejudgment interest amount. SOF ¶¶ 124-1259; see 26 U.S.C. § 6621(a)(2); Hughes Capital, 917 F. Supp. at 1089-90. The Court agrees with these uncontested amounts.

Accordingly, the Court, pursuant to its grant of summary judgment, orders relief in the form of disgorgement in the amounts discussed above against Defendant Cooper. With regard to REOP and the Cooper Companies, the Court, given its entry of default judgment, orders relief in the form disgorgement in the amounts described above.

### iii. Civil Penalties as to Defendants

Finally, The SEC requests "third tier" civil penalties against each of the Defendants. Third tier penalties set the ceiling for penalty amounts and are available when the securities law violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement

[and] such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial loss to other persons." Section 21(d)(3)(B) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(B); see also Graulich, 2013 WL 3146862, at *7. The maximum third tier penalty is the greater of (1) $150,000 per violation for a natural person or $725,000 per violation for any other person (e.g., corporate entity) or (2) the "gross amount of pecuniary gain" to the defendant as a result of the securities law violation. Exchange Act § 21(d)(3)(B), 15 U.S.C. § 78u(d)(3)(B); see Graulich, 2013 WL 3146862, at *7 ("With regard to gross pecuniary gain, many courts have imposed a single penalty equal to the amount of disgorgement.").

In determining the amount of penalty, courts frequently consider such factors as: (1) the egregiousness of the conduct; (2) the degree of scienter; (3) whether the conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the conduct was recurrent; and (5) whether the penalty should be reduced due to demonstrated current and future financial condition. See e.g., SEC v. Secure Capital Funding, No. 11-916, 2014 WL 936722, at *4-5 (D.N.J Mar. 10, 2014).

Defendants' securities violations were egregious, repeated, and carried a high degree of scienter. Cooper violated the law

34

repeatedly over a period of at least four years, using investor funds for his personal use. He had no gainful employment during this period and there is no evidence that the other Defendants had any business operations or earned any legitimate income. Cooper does not admit the wrongful nature of his conduct. He gives no assurance against future violations and, in fact, continues to hold himself out as a successful businessman.

Accordingly, the Court orders that summary judgment shall be entered against Defendant Cooper and relief shall be required in the form of a civil penalty of $2,447,639, equal to the total amount by which he defrauded investors including prejudgment interest. Second, default judgment shall be entered against REOP and relief shall be granted in the form of a civil penalty of $54,016, an amount equal to the "fee" investors paid for the purported acceptance of the Brazilian sovereign bond plus prejudgment interest. Finally, default judgment shall be entered against each of the Cooper Companies and they shall be required to pay a civil penalty equal to their "gross amount of pecuniary gain" (i.e., disgorgement and prejudgment interest): $308,667 for Global Funding, $1,264,272 for Dream Holdings, $320,468 for Fortitude, and $500,216 for Peninsula. SOF ¶¶ 124-125.

An appropriate Order follows.

DATED: November 5, 2015


                                        s/Renée Marie Bumb
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE